**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Coach, Inc., et al.**

  **v.**          Civil No. 12-cv-506-PB
                 Opinion No. 2014 DNH 021
**Peter J. Sapatis, et al.**

**MEMORANDUM AND ORDER**

  This case arises from the sale of counterfeit goods by third party vendors at a flea market in Londonderry, New Hampshire.  Coach, Inc. and Coach Services, Inc., purveyors of designer handbags and other personal goods, have sued Peter J. Sapatis, Londonderry Marketplace, LLC, Alaina E. Paul, and TABA Enterprises, LLC, seeking injunctive relief and damages based on alleged violations of federal and state law relating to trademarks, copyrights, and unfair business practices.  Sapatis and Londonderry Marketplace move for summary judgment.  I grant the motion in full with respect to Londonderry Marketplace and grant it in part and deny it in part with respect to Sapatis.

### I. BACKGROUND

  Most of the evidence presented by Sapatis and Londonderry Market concerns events surrounding Sapatis's sale of the Flea

Market to Paul and TABA in February 2008.  In contrast, nearly
all the evidence presented by Coach[1] relates to events occurring
after the sale.

## A.   <u>Evidence Presented by Sapatis and Londonderry Market</u>

Peter Sapatis has owned a large field and adjacent
residence at 5 Avery Road in Londonderry, New Hampshire since at
least 1991, when he established the Londonderry Flea Market as a
sole proprietorship at that location.  Doc. No. 30-2.  The Flea
Market operates nearly every weekend from April through October.
In 2003, Sapatis formed Londonderry Marketplace, LLC, through
which he operated the Flea Market until 2008.  Sapatis has
always been Londonderry Marketplace's sole owner.  Id.

On February 15, 2008, Sapatis's daughter, Alaina Paul, and
Londonderry Marketplace executed an Asset Purchase Agreement and
bill of sale that transferred ownership of the Flea Market from
Londonderry Marketplace to Paul for $100,000.  Doc. Nos. 30-3,
30-4.  The Agreement specifies that Paul will pay $100,000 to
Londonderry Marketplace over a ten-year period, with interest
accruing on the outstanding balance.  Doc. No. 30-3.  Paul
contemporaneously assigned her entire interest in the Flea

---

[1] Coach, Inc. and Coach Services, Inc. have referred to
themselves collectively as "Coach" throughout the pleadings.  I
follow their lead here.

Market to TABA Enterprises, LLC, a company owned solely by Paul. Doc. Nos. 30-2, 30-5.

The sale of the Flea Market did not include the land upon which it operates. Doc. Nos. 30-3, 30-4. Paul and Sapatis contemporaneously executed a five-year commercial lease of all the land at 5 Avery Road exclusive of Sapatis's home and the surrounding three acres. Doc. No. 30-6. The lease states that the property may only be used for the operation of an outdoor flea market. It specifies $36,000 in annual rent, made in two equal payments each year on the first of June and November. Id.

Sapatis continued operating the Flea Market's concession stand through the end of 2008, and then retired from the Flea Market. Doc. Nos. 30-2, 30-3. Londonderry Marketplace ceased doing business in 2009, ceased filing annual reports with the New Hampshire Secretary of State in 2011, and was administratively dissolved. Doc. No. 30-2. Sapatis has never been an employee of Paul or TABA or an employee or agent of any vendor at the Flea Market. Rather, TABA employs Linda Morrow to assist Paul with the Flea Market's operations. Since 2008, all vendors have contracted exclusively with TABA, Sapatis has not derived any direct income from the Flea Market or its vendors, and Sapatis has not conducted any advertising for the Flea

3

Market.  He continues to volunteer his time at the Flea Market because he wants his daughter's business to succeed, but he claims that he has had nothing whatsoever to do with the alleged sale of counterfeit goods at the Flea Market.  <u>Id.</u>

**B.**   <u>**Evidence Presented by Coach**</u>

Since the sale of the Flea Market to Paul and TABA in 2008, Paul has paid Sapatis $12,000 each year toward the outstanding balance she owes him – currently $40,000 - although she is unsure exactly how and when these payments have been made.  <u>Doc. Nos. 36-2, 36-4</u>.  Each of Paul's payments is completely offset by an annual gift of $12,000 that Sapatis makes to Paul.  <u>Id.</u> None of these transactions have been recorded, and interest has never accrued on the outstanding balance.  <u>Doc. No. 36-4</u>.  The last time that Sapatis looked at the Asset Purchase Agreement was when it was executed in 2008.  <u>Id.</u>

The $36,000 in annual rent specified in Paul's lease is paid to Sapatis out of the admission fees that customers pay to enter the Flea Market and the rent that vendors pay to operate their stands.  <u>Doc. No. 36-2</u>.  Sapatis, who keeps the Flea Market's books, pays himself rent out of these proceeds and records the payments on Paul's behalf.  <u>Doc. Nos. 36-2, 36-4</u>. Paul has no involvement in the payments other than reviewing the

4

records with Sapatis at the end of the year.  Sapatis claims

that he receives rent payments in the form of both cash and

personal checks that he writes to himself in Paul's name,

whereas Paul claims that the rent payments are made solely in

cash.  Id.  Contrary to the lease terms, the payments are not

made in two equal annual installments because "we've changed to

whatever is okay at the time."  Doc. No. 36-2.

Paul alleges that TABA has owned and managed the Flea

Market since February 15, 2008 and that she receives mail for

the Flea Market at 5 Avery Road.  Id.  Sapatis continues to

reside at that address with his girlfriend Morrow, however,

while Paul resides in Manchester.  Doc. No. 36-4.  The Flea

Market's business office is located in Sapatis's home.  Doc.

Nos. 36-2, 36-4.  It houses the Flea Market's telephone line as

well as its vendor policy manuals for 2010 and 2011, which are

each signed "Pete Sapatis."[2]  Id.; see Doc. No. 36-5.

Sapatis claims that he has retired and that Morrow is

primarily responsible for the Flea Market whenever Paul is

otherwise occupied, but Paul claims that Sapatis has never

---

[2] Sapatis has not physically signed these policy manuals; rather,
"Pete Sapatis" is typed at the bottom of what appears to be the
final page of each manual, immediately below a space where the
documents' creator would be expected to sign.  See Doc. No. 36-
5.

5

retired and continues to assist her alongside Morrow in the
operation of the Flea Market.  Doc. Nos. 36-2, 36-4.  Sapatis
buys supplies for the Flea Market; maintains the grounds;
provides business advice to Paul; answers calls on the Flea
Market's main telephone line; keeps the books for the Flea
Market (including forecasting future expenses and determining
the Flea Market's liquidity needs); shows potential vendors
available spaces for rent in the Flea Market; mediates arguments
amongst vendors, customers, and the police, including arguments
concerning the sale of counterfeit goods; and circulates through
the Flea Market "all weekend" to keep aisles clear, inform
vendors of Flea Market policies, maintain relationships with
long-term vendors, and collect vendors' rent payments (including
cash and checks made payable to either TABA or Sapatis himself).
In short, Sapatis does "[a]lmost anything he thinks he needs to
help [Paul] with," whether at Paul's direction or not.  Id.

On June 26, 2011, two private investigators working for
Coach, Andrea Powers and Michael Surette, arrived at the Flea
Market and asked to speak to its owner.  Doc. Nos. 35, 36-4.
Sapatis was summoned and Powers and Surette informed him that
counterfeit Coach products were being sold at the Flea Market.
Id.  Sapatis immediately called Morrow and a Londonderry police

6

officer, who accompanied Powers and Surette while they inspected the Flea Market, purchased a number of counterfeit Coach products from vendors, and served these vendors with cease and desist orders.  Doc. Nos. 36-1, 36-2, 36-4.  Paul believes that she was working at the Flea Market's concession stand at the time "[b]ecause that's what I usually do."  Doc. No. 36-2.

On August 2, 2011, Coach sent a letter to the "Owner/Manager[,] Londonderry Flea Market" alleging that counterfeit Coach products were being sold by Flea Market vendors and that those responsible for the Flea Market could be held liable if they failed to stop this unlawful activity.  Doc. No. 36-1.  Sapatis received this letter and attempted to contact Coach's counsel to seek assistance in complying with its instructions, although Sapatis is unsure whether he actually spoke with a representative of Coach at this time.  Doc. No. 36-4.  In September 2011, Sapatis called Surette "on behalf of the flea market" and offered to pay him to conduct another inspection.  Doc. Nos. 35, 36-4.  After conducting this inspection without payment on October 9, 2011, Surette informed Sapatis that the Flea Market was "clean, but not to say that you're going to stay th[at] way."  Id.  Sapatis responded that he "eventually would like to get out of the flea market

business." Doc. No. 35.  Surette assumed that Sapatis was still
involved in the Flea Market's management and operation.  Id.
Powers subsequently sent a letter to "Peter Sepatis [sic][,]
Owner[,] Londonderry Flea Market" on November 9, 2011 containing
trademark images for a variety of brands to assist him in
identifying counterfeit products at the Flea Market. Doc. No.
36-7.  Sapatis then called Powers to obtain additional copies of
the letter, which he planned to distribute to vendors. Doc. No.
36-4.

On April 29, 2012, Surette visited the Flea Market a third
time and purchased counterfeit Coach products from five vendors.
Doc. Nos. 36-2, 36-3.  After this unannounced inspection,
Surette spoke with Sapatis about the ongoing sale of counterfeit
products at the Flea Market. Doc. No. 36-2.  On May 14, 2012,
Coach mailed another letter, similar in content to the August
2nd letter, to the "Owner/Manager[,] Londonderry Flea Market".
Doc. No. 36-3.  Paul received this letter and shared it with
Sapatis and Morrow. Doc. Nos. 36-2, 36-4.  Sapatis then called
Coach's counsel seeking "help in taking care of this
counterfeiting problem." Doc. Nos. 34, 36-4.  Neither Paul nor
anyone associated with TABA ever communicated with Coach or any

8

of its representatives prior to Coach suing Paul and TABA in June 2013. Doc. No. 36-2.

During discovery, TABA produced numerous email messages sent from the Flea Market's main email address between February 27, 2011 and August 7, 2013. Doc. No. 36. Six hundred fifty-five of these messages identified Sapatis as the sender, whereas only forty-five messages originated from Paul. Id.; see, e.g., Doc. Nos. 36-8, 36-9, 36-10, 36-11. In response to one message from a customer asking whether counterfeit products of a particular brand were for sale at the Flea Market, Sapatis responded on June 26, 2012 that they were not, but encouraged the customer to visit nonetheless because "[y]ou will most likely find something you want to have!" Doc. No. 36-9.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is considered genuine if the evidence allows a reasonable jury to resolve the point in favor of the nonmoving party, and a fact is considered material if it "is one 'that might affect the outcome of the suit under the governing law.'"

United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, I examine the evidence in the light most favorable to the nonmoving party.  Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

The party moving for summary judgment bears the initial burden of identifying the portions of the record it believes demonstrate an absence of disputed material facts.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In determining what constitutes a material fact, "we safely can ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'"  Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## III.  ANALYSIS

### A.  Claims Against Sapatis

Coach brings eight claims against Sapatis: (1) contributory trademark counterfeiting[3] (15 U.S.C. § 1114); (2) contributory

---

[3] The first two counts of Coach's amended complaint, "contributory trademark counterfeiting" and "contributory trademark infringement", arise under the same section of the

trademark infringement (15 U.S.C. § 1114); (3) contributory

trade dress infringement (15 U.S.C. § 1125(a)); (4) contributory

false designation of origin and false advertising (15 U.S.C. §

1125(a)); (5) contributory trademark dilution (15 U.S.C. §

1125(c)); (6) contributory copyright infringement (17 U.S.C. §

501); (7) state common law trademark infringement; and (8) state

common law unfair competition.  I first analyze the claims

arising under federal law before turning to the state law

claims.

    1.  <u>Federal Law Claims (Counts I through VI)</u>

    Sapatis moves for summary judgment on Counts I through VI

based solely on his contention that ownership and lease of the

land upon which the Flea Market operates, without any

significant involvement in the Flea Market's operations or the

---

Lanham Act, <u>see</u> 15 U.S.C. § 1114, and courts use the two terms
interchangeably.  <u>See</u> <u>Coach, Inc. v. Farmers Mkt. & Auction</u>, 881
F. Supp. 2d 695, 700 (D. Md. 2012); <u>Roger Cleveland Golf Co.,
Inc. v. Prince</u>, No. 2:09-2119-MBS, 2012 WL 1106775, at *1
(D.S.C. Mar. 30, 2012); <u>Feiya Cosmetics, LLC v. Beyond Beauty
Int'l, LLC</u>, No. C-10-00967-JCS, 2011 WL 4506182, at *10 (N.D.
Cal. Aug. 29, 2011), <u>rep. & rec. adopted</u>, No. C-10-0967-PJH,
2011 WL 4506165 (N.D. Cal. Sept. 29, 2011); <u>Marvisi v. Greenwich
Ins. Co.</u>, No. 04-CV-6733 (TPG), 2006 WL 1422693, at *2 (S.D.N.Y.
May 23, 2006).  I therefore consider Counts I and II
collectively under the more frequently used term "contributory
trademark infringement."  <u>See, e.g.</u>, <u>Sony Corp. of Am. v.
Universal City Studios, Inc.</u>, 464 U.S. 417, 489 (1984)
(Blackmun, J., dissenting) (citing <u>Inwood Labs., Inc. v. Ives
Labs., Inc.</u>, 456 U.S. 844, 860 (1982) (White, J., concurring in
the result)).

conduct of its vendors, is insufficient to hold him contributorially liable under any legal theory.  Coach counters that undisputed evidence of Sapatis's actual involvement with the Flea Market clearly establishes a genuine issue of material fact with respect to each cause of action.[4]  I agree with Coach.

### a. Contributory Trademark Infringement (Counts I, II)

In Inwood Laboratories, Inc. v. Ives Laboratories, Inc., the Supreme Court interpreted section 32 of the Lanham Act, 15 U.S.C. § 1114, to prohibit contributory trademark infringement by those who facilitate, rather than engage directly in, trademark infringement as defined by the Act.  456 U.S. 844, 854 (1982).  The Court held that a provider of a product who (1) "intentionally induces another to infringe a trademark" or (2) "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement" is "contributorially responsible for any harm done as a result of the deceit."  Id.; see also Getty Petroleum Corp. v. Aris Getty, Inc., 55 F.3d 718, 719-20 (1st Cir. 1995) (sole First Circuit

---

[4] For purposes of this motion for summary judgment, the parties dispute only Sapatis's degree of control over the Flea Market and its vendors, not the separate but related issues of his notice of the vendors' infringing conduct and the sufficiency of any steps taken to stop it.  Cf. Coach, Inc. v. Gata Corp., No. 10-CV-141-LM, 2011 WL 2358671, at *7-10 (D.N.H. June 9, 2011). I take no position concerning the latter issues at this time.

decision referencing the Inwood standard).  As the Ninth Circuit
later explained, the contributory liability doctrine in
trademark and copyright law is "an outgrowth of enterprise
liability . . . and imposes liability where one person knowingly
contributes to the infringing conduct of another." Fonovisa,
Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996)
(citing Demetriades v. Kaufmann, 690 F. Supp. 289, 292 (S.D.N.Y.
1988); 3 Melville Nimmer & David Nimmer, Nimmer on Copyright §
1204[a][2], at 1275 (1995)); see also Hard Rock Cafe Licensing
Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1148-49 (7th
Cir. 1992) (citing David Berg & Co. v. Gatto Int'l Trading Co.,
884 F.2d 306, 311 (7th Cir. 1989); Restatement (Second) of Torts
§ 877(c) & cmt. d (1979)) ("[W]e have treated trademark
infringement as a species of tort and have turned to the common
law to guide our inquiry into the appropriate boundaries of
liability.").  Although the Inwood standard for contributory
trademark infringement expressly references only products –
unsurprising since that case concerned the sale of products used
to infringe a third party's trademark - the doctrine has since
been expanded to govern the activities of service providers as
well, including those who operate flea markets where vendors
sell counterfeit goods.  See, e.g., Coach, Inc. v. Goodfellow,

717 F.3d 498, 500 (6th Cir. 2013); Fonovisa, 76 F.3d at 265;

Hard Rock, 955 F.2d at 1148.

Coach has not alleged that Sapatis intentionally induced

vendors to infringe its trademarks under Inwood's first prong.

Rather, Coach claims that Sapatis violated Inwood's second prong

by continuing to provide his services to particular vendors whom

he knew or had reason to know were infringing Coach's

trademarks. Doc. No. 26; see Inwood, 456 U.S. at 854.

To date, no court of appeals has held a defendant who was

not a flea market's owner contributorially liable for trademark

or copyright infringement arising from a vendor's unlawful

conduct at the site. See Goodfellow, 717 F.3d at 500; Fonovisa,

76 F.3d at 265; Hard Rock, 955 F.2d at 1148. Furthermore, the

parties have directed me to no lower-level decision that has

found liability under such circumstances. Sapatis's argument -

that mere ownership of the land, without any concomitant

ownership interest in the Flea Market, precludes contributory

liability – is thus not unreasonable at first glance. See Doc.

No. 30-1.

The cases make abundantly clear, however, that the relevant

inquiry is not whether the defendant owned the venue where

trademark infringement took place, but whether the defendant had

14

sufficient control over the individuals directly engaging in
such infringement.  See Lockheed Martin Corp. v. Network
Solutions, Inc., 194 F.3d 980, 984 (9th Cir. 1999) (citing
Fonovisa, 76 F.3d at 265; Hard Rock, 955 F.2d at 1148–49) ("[W]e
consider the extent of control exercised by the defendant over
the third party's means of infringement. . . .  Direct control
and monitoring of the instrumentality used by a third party to
infringe the plaintiff's mark" is sufficient to meet the Inwood
standard).  Sapatis initially attempts to escape this conclusion
by relying on an unpublished decision in which a flea market
landlord escaped contributory liability.  See Doc. No. 30-1
(citing Malletier v. The Flea Mkt., Inc., 2009 WL 1625946, at *3
(N.D. Cal. June 10, 2009) ("No case supports the proposition
that a property owner may be liable for contributory trademark
infringement if it only leases property to a separate and
distinct entity, which in turn operates a flea market and rents
space to a vendor, which in turn infringes trademarks.  Property
ownership alone does not establish that Defendant exercised
control over the sale of the infringing products.")).  But as
Coach makes exceedingly clear, Sapatis's activities went far
beyond "only" owning the land and leasing it to a separate
entity.  See Doc. No. 33-1.  Ultimately, Sapatis concedes that

the defendant's degree of control over the infringer - rather
than his or her nominative status as owner, lessor, or lessee –
is the determinative factor.  See Doc. No. 30-1 ("The key issue
in determining whether to hold a service provider liable for
contributory trademark infringement under the second Inwood
standard is whether the defendant can exercise control over the
direct infringer.").

The parties cite a handful of cases that serve as useful
guideposts in determining the degree of control required for
contributory liability to attach.  In Goodfellow, the Sixth
Circuit held that a flea market owner and operator who
"provide[d] . . . rental booths and storage units for vendors"
was contributorily liable when he had reason to know of
trademark infringement committed by some vendors.  717 F.3d at
503.  Finding "little difficulty in holding that the allegations
in this case are sufficient to show" control, the Ninth Circuit
noted in Fonovisa that "it would be difficult for the infringing
activity to take place in the massive quantities alleged without
the support services provided by the [flea market].  These
services include, inter alia, the provision of space, utilities,
parking, advertising, plumbing, and customers." 76 F.3d at 264.
In a recent case in which Coach successfully sued a different

16

New Hampshire flea market for contributory trademark
infringement, Judge McCafferty noted that "[t]he issue of
proximity [between the defendant and the infringing vendors] . .
. is related to the issue of control, which is a key component
of the analysis." Coach, Inc. v. Gata Corp., No. 10-CV-141-LM,
2011 WL 2358671, at *7 (D.N.H. June 9, 2011).  Accordingly, she
found that "the operator of a flea market that rents spaces to
vendors exercises substantial[] . . . control over potential
direct infringers . . . ." Id. at *8.

     In contrast, the Seventh Circuit in Hard Rock discussed a
useful hypothetical in which a "temporary help service . . .
might not be liable if it furnished [a flea market vendor] the
workers he employed to erect [the] stand" from which the vendor
sold counterfeit goods.  955 F.2d at 1148–49.  Such minimal
control as that exercised by the temporary worker over an
infringing vendor is analogous to the negligible control
exercised by companies that provide services over the internet,
such as credit card payment processing or registration of domain
names, to third parties who publish infringing content on web
sites utilizing those services.  See, e.g., Perfect 10, Inc. v.
Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007)
(payment processing); Lockheed Martin, 194 F.3d at 985 (domain

17

name registration).  The defendants' attenuated relationship with, and control over, the unlawful conduct in these cases absolved them of contributory liability.

Viewing the evidence in the light most favorable to Coach, I conclude that Sapatis exercised sufficient control over the Flea Market and its vendors during the time period in question for a reasonable jury to hold him contributorily liable for the vendors' conduct.[5]  Coach's allegations strongly support the inference that Sapatis's contribution to the Flea Market's operations "increased the level of infringement by providing a centralized place . . . where infringing works could be collected, sorted, found, and bought, sold, or exchanged."  See Visa, 494 F.3d at 799; see also Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1174 (9th Cir. 2007) (noting the significance in Fonovisa that the defendant "had the ability to identify and police infringing activity by patrolling its premises").  A jury could reasonably believe that Sapatis essentially was the Flea Market in the eyes of customers (who received the bulk of their email responses from Sapatis, had

---

[5] Even if I were to consider the evidence in the light most favorable to Sapatis, I would likely reach the same conclusion. That is because many of the undisputed facts forming the basis of Coach's claims are taken directly from Sapatis's own deposition testimony.  See Doc. No. 36-4.

their phone calls answered by Sapatis, witnessed him patrolling the Flea Market "all weekend", and resolved their arguments with vendors); in the eyes of vendors (who were shown spaces to rent by Sapatis, were informed by Sapatis about Flea Market policies that had been developed by Sapatis, maintained longstanding relationships with Sapatis, and sometimes wrote their rent checks directly to Sapatis); and in the eyes of third parties such as Coach (who, until this lawsuit, consistently referred to Sapatis as the Flea Market's owner without ever being corrected by Sapatis or anyone else).  Many vital aspects of the Flea Market's operations were also controlled by Sapatis, including bookkeeping, groundskeeping, provision of supplies, and financial decision-making.  Although Sapatis claims to have received no direct income from the Flea Market or its vendors, this seriously misrepresents the fact that he personally drew rent payments directly from customer admission fees and vendor rent payments, on his own schedule and without Paul's involvement.  Even if Paul and TABA technically owned the Flea Market and contracted with its vendors, a reasonable jury could conclude on the basis of these facts that if anyone exercised the requisite control over the Flea Market's vendors (including those who infringed Coach's trademarks), it was Sapatis.

19

Accordingly, I deny summary judgment to Sapatis on Counts I and
II.

> **b. Contributory Trade Dress Infringement;
>     Contributory False Designation of Origin
>     And False Advertising; and Contributory
>     Trademark Dilution (Counts III-V)**

Although neither the Supreme Court nor the First Circuit
have discussed contributory trade dress infringement, "several
influential courts have recognized [it] as a cause of action."
See Coach, Inc. v. Farmers Mkt. & Auction, 881 F. Supp. 2d 695,
703 (D. Md. 2012) (citing Coach, Inc. v. We Care Trading Co.,
Inc., 67 Fed. App'x 626, 630 (2d Cir. 2002) (upholding jury
verdict for contributory trade dress infringement); Bauer Lamp
Co., Inc. v. Shaffer, 941 F.2d 1165, 1171 (11th Cir. 1991) ("A
person who knowingly participates in furthering . . . trade
dress infringement is liable as a contributing party."); 
R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 84 (S.D.N.Y.
2009) ("[T]hose who knowingly play a significant role in
furthering trade dress infringement are liable as contributing
parties.")).

The same is true for contributory false designation of
origin and false advertising.  See id. at 704-05 (citing Societe
Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380
F.3d 126, 133 (2d Cir. 2004); Fare Deals Ltd. v. World Choice

Travel.com, Inc., 180 F. Supp. 2d 678, 686-87 (D. Md. 2001);
Grant Airmass Corp. v. Gaymar Indus., Inc., 645 F. Supp. 1507,
1511-12 (S.D.N.Y. 1986)) ("[T]o state a claim for contributory
false designation of origin and false advertising, Coach must
[show] . . . that (1) despite knowing that the Vendor Defendants
were using in commerce the plaintiff's mark in a manner likely
to confuse consumers about the source or sponsorship of the
goods or services, (2) the Market Defendants continued to supply
a means of infringement (3) over which they had means of control
or monitoring and which they have actively supported through
various promotional efforts." (internal quotation marks
omitted)); see also ADT Sec. Servs., Inc. v. Sec. One Int'l,
Inc., No. 11-CV-05149-YGR, 2012 WL 4068632, at *3 (N.D. Cal.
Sept. 14, 2012) ("In light of other courts' reasoned extension
of a claim for contributory false advertising . . . under the
Lanham Act, the Court similarly finds such an extension to be
appropriate.").

Lastly, although the Supreme Court and First Circuit have
not addressed a contributory trademark dilution claim, this
court has recognized such a cause of action once before.  See
Coach, Inc. v. Gata Corp., No. 10-CV-141-LM, 2011 WL 1582954, *5
(D.N.H. Apr. 26, 2011) (holding that a cause of action for

21

contributory trademark dilution "does, in fact, exist," but declining to analyze it at the motion to dismiss stage). Another district court has explained that the claim requires a showing that the defendant "either encouraged others to dilute or, as in Inwood Laboratories, continued to supply their product [or service] to one whom it knows or has reason to know is engaging in trademark infringement . . . ." Farmers Mkt. & Auction, 881 F. Supp. 2d at 706 (internal quotation marks omitted); see also Lockheed Martin, 194 F.3d at 986 (citing Kegan v. Apple Computer Inc., 42 U.S.P.Q.2d 1053, 1062 (N.D. Ill. 1996)) ("The one court to recognize the contributory dilution cause of action defined the claim as encouraging others to dilute. . . .  The proposed cause of action thus appears to import the definition of 'contributory' from Inwood . . . ."); Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 526 (S.D.N.Y. 2008) (assuming without deciding that a contributory trademark dilution cause of action exists and analyzing it under the Inwood framework), aff'd in part, rev'd on other grounds in part, 600 F.3d 93 (2d Cir. 2010).

Because the parties proceed as if all three causes of action exist in this circuit, and that they each essentially incorporate Inwood's "supplies its [service] to one whom it

knows or has reason to know is engaging in [unlawful conduct]"
standard, I assume without deciding that the parties are correct
in their beliefs.  Sapatis moves for summary judgment with
respect to each count on the sole ground that he exercised
insufficient control over the Market and its vendors to satisfy
the Inwood standard.  Consequently, I deny his motion on Counts
III, IV, and V for the reasons discussed above.

### c.  Contributory Copyright Infringement (Count VI)

The First Circuit has never directly addressed contributory
copyright infringement, and the two Supreme Court cases
discussing the doctrine have primarily dealt with aspects not at
issue in this case.  See Metro-Goldwyn-Mayer Studios Inc. v.
Grokster, Ltd., 545 U.S. 913, 930 (2005) (citing Gershwin Publ'g
Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d
Cir. 1971)) (noting that "[o]ne infringes [a copyright]
contributorily by intentionally inducing or encouraging direct
infringement," but addressing only intentional inducement); Sony
Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 442
(1984) (establishing a safe harbor precluding contributory
copyright liability for the provision of products with
"commercially significant noninfringing uses").  One analogous
case concerning contributory copyright infringement in the

23

context of a flea market has reached the courts of appeal,
however.  See Fonovisa, 76 F.3d at 261.  The Ninth Circuit in
Fonovisa applied a "material contribution to the infringing
activity" standard to hold that the plaintiff had stated a claim
against a flea market owner for contributory copyright
infringement, relying on essentially the same facts as it did in
the contributory trademark infringement context.  See id. at
264; cf. Sony, 464 U.S. at 487 (Blackmun, J., dissenting)
("[O]ne who, with knowledge of the infringing activity, induces,
causes or materially contributes to the infringing conduct of
another, may be held liable as a 'contributory' [copyright]
infringer." (quoting Gershwin, 443 F.2d at 1162)).  While noting
that "[t]he doctrine of contributory copyright infringement . .
. is not well-defined," Justice Blackmun concluded in Sony that
liability "may be imposed even when the defendant has no formal
control over the infringer."  464 U.S. at 487 (Blackmun, J.,
dissenting).

Regardless of the precise terminology employed, it is
sufficient for the purposes of this case to note that
"[contributory] trademark infringement liability is more
narrowly circumscribed than [contributory] copyright
infringement . . . ."  See Fonovisa, 76 F.3d at 265 (citing Hard

24

Rock, 955 F.2d at 1149); accord Visa, 494 F.3d at 806; Contessa Food Prods. Inc. v. Lockpur Fish Processing Co., 123 F. App'x 747, 751 n.3 (9th Cir. 2005); see also Sony, 464 U.S. at 439 n.19 (contrasting the broader standard for contributory copyright infringement with Inwood's "narrow standard for contributory trademark infringement").  If a reasonable jury could find that Sapatis's actions satisfied the Inwood contributory trademark infringement standard, it could similarly find that they satisfied the less stringent "material contribution" standard for contributory copyright infringement. Accordingly, I deny Sapatis summary judgment on Count VI for the reasons discussed above.

    2.  State Law Claims (Counts VII and VIII)

        **a.**  **Common Law Contributory Trademark Infringement (Count VII)**

Sapatis notes, correctly, that the New Hampshire Supreme Court has never recognized a cause of action for contributory trademark infringement.[6]  If that court were to do so, according

---

[6] Sapatis also notes that a literal reading of Coach's amended complaint indicates that it states a claim for direct trademark infringement under New Hampshire common law without alleging contributory liability.  See Doc. No. 26 ("Defendants . . . have used and are continuing to use spurious designations that are identical to . . . the Coach Trademarks. . . . in violation of the common law.").  He contends that the claim fails due to lack of evidence demonstrating that he, rather than the vendors,

to Sapatis, it would likely analyze the claim under the federal
Inwood standard.  Sapatis contends that his activities at the
Flea Market during the relevant time period fail to meet that
standard, warranting summary judgment in his favor.

Although the case law is scant, the New Hampshire Supreme
Court appears to rely primarily on federal law when state
trademark claims arise.  See, e.g., Nordic Inn Condo. Owners'
Ass'n v. Ventullo, 151 N.H. 571, 576 (2004) (adopting the
federal law doctrine of estoppel by laches for state common law
trademark claims).  If it were presented with the issue, I see
no reason why the New Hampshire Supreme Court would not
recognize the common law tort of contributory trademark
infringement in line with the Inwood standard.  Accordingly, I
assume without deciding that a cause of action for contributory
trademark infringement exists under state law and deny Sapatis's
motion for summary judgment on Count VII for the reasons
discussed above.

---

directly infringed Coach's trademarks.  Coach's objection to
Sapatis's motion for summary judgment makes clear that it
intended to assert a common law contributory trademark
infringement claim.  See Doc. No. 33-1.  Because both sides have
made their arguments regarding common law contributory
liability, I decline Sapatis's invitation to conduct the
meaningless exercise of granting him summary judgment on this
Count, then granting Coach leave to amend its complaint to more
clearly assert the appropriate claim.

**b.   Common Law Unfair Competition (Count VIII)**

"[T]he New Hampshire Supreme Court has not defined the exact contours of common-law unfair competition . . . ." Mueller Co. v. U.S. Pipe & Foundry Co., No. 03-170-JD, 2003 WL 22272135, at *5 (D.N.H. Oct. 2, 2003) (quoting Optical Alignment Sys. & Inspection Servs., Inc. v. Alignment Servs. of N. Am., Inc., 909 F. Supp. 58, 61 (D.N.H. 1995)).  Coach directs me to a decision of this court which concludes that New Hampshire would recognize such a claim under the framework described in the Restatement.  See Pacamor Bearings, Inc. v. Minebea Co., 918 F. Supp. 491, 501 (D.N.H. 1996) ("[O]ne who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another . . . is subject to liability to the other . . . ." (quoting Restatement (Third) Unfair Competition § 2 (1995))).  Accepting Pacamor Bearings's conclusion for the purposes of analysis, Coach must identify a genuine issue of material fact with respect to the following elements: "(a) [Sapatis's] representation is material, in that it is likely to affect the conduct of prospective purchasers; and (b) there is a reasonable basis for believing that the

27

representation has caused or is likely to cause a diversion of trade from [Coach] or harm to [its] reputation or good will." See id. (quoting Restatement (Third) Unfair Competition § 3).

"Assuming without deciding . . . that New Hampshire would recognize a viable unfair competition [claim] in a case where someone 'engages in conduct which deceives the general buying public,'" see Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 304-05 (D.N.H. 2012) (quoting Optical Alignment, 909 F. Supp. at 61), Coach has failed to identify any material representation made by Sapatis that likely deceived or misled a potential customer. Coach points in general terms to Sapatis's "interface with vendors and customers on behalf of the Flea Market, his marketing of its commercial activities, and his supervision [of] the vendors who sold the Infringing Products . . . ." Doc. No. 33-1. It is certainly likely that these activities gave customers (as well as vendors and representatives of Coach) the false impression that Sapatis continued to own the Flea Market beyond 2008. But at least for purposes of an unfair competition claim, his representations (if the aforementioned activities can be called that) were not material because no evidence indicates that they "affect[ed] the conduct of prospective purchasers" or were "likely to cause a

28

diversion of trade from [Coach] or harm to [its] reputation or good will."  See Pacamor Bearings, 918 F. Supp. at 501.  In all likelihood, customers would have behaved exactly the same way, and Coach would have suffered exactly the same harm, even if customers had no doubt that Paul and TABA were the Flea Market's proprietors.

The only specific representation that Coach directs me to is Sapatis's June 26, 2012 email message to a potential customer "invit[ing him or her] to visit the Flea Market in response to requests for 'fake' products for sale." Doc. No. 33-1 (citing Doc. No. 36-9).  That customer inquired whether "you have any tables that sell fake ray bans . . . ," to which Sapatis replied, "There are hundreds of sellers who are here to sell many different items!  You will most likely find something you want to have!  As for the fake ray bans? . . . I think there is [sic] none." Doc. No. 36-9.  Regardless of whether this message contains some hidden meaning that misled the customer about the authenticity of certain sunglasses for sale at the Flea Market, one thing is clear – it says absolutely nothing about Coach's products, authentic or not.

It may be true, as Coach claims, that "[t]he sale of counterfeit products gives rise to the inference of consumer

29

confusion," see Doc. No. 33-1, but that would only support an unfair competition claim against the infringing vendors.  As for Sapatis, nothing in the record indicates that he ever made a representation that "[d]eceived consumers and the public into believing that Infringing Products are genuine or authorized by Coach."  See id.  I therefore grant summary judgment to Sapatis on Count VIII.

## B.  Claims Against Londonderry Marketplace

Coach seeks to hold Londonderry Marketplace liable for all the same claims it asserts against Sapatis.  Londonderry Marketplace argues that it had nothing to do with the Flea Market after November 2008, and it thus cannot be held liable for any allegedly unlawful activity occurring there in 2011 and 2012.  In a sworn affidavit, Sapatis states:

> During the 2008 flea market season, Londonderry Marketplace, LLC ran the food concession at the Flea Market, but TABA Enterprises ran the flea market portion of the business.  After the end of the 2008 flea market season, and into 2009, Londonderry Marketplace, LLC wound down its operations.  It ceased to do business altogether in 2009.  I stopped filing annual reports with the Secretary of State for Londonderry Marketplace, LLC in 2011 as I had no intention of reviving the business, and the company has now been administratively dissolved.

Doc. No. 30-2.  Coach counters that Sapatis "has continued to act in a manner consistent with his earlier actions on behalf of

[Londonderry Marketplace] without differentiating between his individual actions and those taken on behalf of the company," and that Sapatis "draws no meaningful distinction between his individual activities and those undertaken as a representative of his company." Doc. No. 33-1. But Coach presents no evidence to support this claim.

There is no mention of Londonderry Marketplace in the record after 2008, save for Sapatis's brief discussion of its winding down and administrative dissolution. Coach points to no specific evidence showing that Sapatis purported to act on behalf of Londonderry Marketplace in his dealings with the Flea Market at any point after 2008. Indeed, Coach concedes that "Sapatis's unambiguous representations in his affidavit . . . strongly suggest that [his] infringing activities, at least since some point in 2009, were entirely undertaken on his own, individual behalf and not as a representative of [Londonderry Marketplace]." Doc. No. 33-1 (citing Doc. No. 30-2). Because Coach has presented no evidence linking the company to the alleged unlawful activity occurring at the Flea Market, I grant summary judgment to Londonderry Marketplace on all counts.[7]

---

[7] Coach notes that Londonderry Marketplace is "apparently urging that the company's inactivity justifies, in whole or in part, the entry of summary judgment in its favor." Doc. No. 33-1.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons I grant the motion for summary judgment as it relates to Londonderry Marketplace in full, grant the motion as it relates to Sapatis on Count VIII, and deny it as it relates to Sapatis on all other counts. (Doc. No. 30).

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

January 31, 2014

cc:   Erica Mecler Caron, Esq.
      Jeffrey K. Techentin, Esq.
      Kyle Zambarano, Esq.
      Lisa Snow Wade, Esq.
      Robert S. Carey, Esq.
      Jeremy T. Walker, Esq.
      Nicholas F. Casolaro, Esq.

---

Coach counters that Londonderry Marketplace "has been placed in an administrative dissolution status, but has not yet been dissolved." <u>Id.</u>  In light of my ruling, I need not determine Londonderry Marketplace's exact corporate status or consider how a New Hampshire corporation's administrative dissolution, <u>see</u> N.H. Rev. Stat. Ann. § 293-A:14.21, might affect its liability under the instant claims.