UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Coach, Inc., et al.

    v.

Peter J. Sapatis, et al.

Civil No. 12-cv-506-PB
Opinion No. 2014 DNH 140

MEMORANDUM AND ORDER

This case arises from the sale of counterfeit goods by third party vendors at a flea market in Londonderry, New Hampshire.  Coach, Inc. and Coach Services, Inc.,[1] purveyors of designer handbags and other personal goods, have sued Peter J. Sapatis, Londonderry Marketplace, LLC, Alaina E. Paul, and TABA Enterprises, LLC, seeking injunctive relief and damages based on alleged violations of federal trademark and copyright law.  Paul and TABA moved for summary judgment.  I deny the motion.

I.  BACKGROUND

A detailed background of this case is provided in a previous order, Coach, Inc. v. Sapatis, 2014 DNH 021.  I thus limit my discussion to those facts that are relevant to Paul's motion for summary judgment.

_____

[1] Coach, Inc. and Coach Services, Inc. have referred to themselves collectively as "Coach" throughout the pleadings.  I follow their lead here.

Paul is the owner, manager, and sole member of TABA, a
limited liability corporation that has both owned the
Londonderry Flea Market and leased the land upon which it
operates since 2008.  Doc. No. 30-5.  All vendors at the Flea
Market contract exclusively with TABA to rent space for their
booths.  Doc. No. 30-2.  Paul exercises direct control over all
of TABA's employees, delegates certain duties to them, and
retains ultimate authority over them.[2]  Doc. Nos. 30-2, 47-4.
Paul also retains sole responsibility for TABA's anti-
counterfeiting efforts.  Doc. No. 47-4.

Since 2008, Paul has been present at the Flea Market every
day that it has been open.  Id.  Although the bulk of Paul's
day-to-day activities are devoted to the operation of the
concession stand, she admits that she is "responsible for
everything" at the Flea Market.  Doc. No. 42-11.  Paul
personally participates in activities such as "checking in
vendors who want to rent space, assigning them [to their

---

[2] For instance, Paul delegated the task of supervising a group of
vendors at the Flea Market who sold handbags, accessories,
women's wear, and other clothing to Linda Morrow, a TABA
employee.  Doc. No. 42-11.  The vendors who allegedly sold
counterfeit Coach products were part of this group.  Id.  The
Flea Market's previous owner, Sapatis, was also significantly
involved in the Flea Market's operations.  See Sapatis, 2014 DNH
021, 18-19.  Coach argues that Sapatis acted as Paul's agent
despite not being employed by TABA, a contention I need not
address at this time.

spaces], listening to vendors['] . . . suggestions, checking on
vendors, especially now to make sure that they're following
policies[, and] . . . . help[ing] customers." Id.  In addition,
Paul collaborates with Sapatis and Morrow to create and revise
the Flea Market's vendor policies, which include a prohibition
on the sale of counterfeit goods.  Id.

Paul also controls the Flea Market's e-mail account,
londonderryfleamarket@gmail.com, which is used to communicate
with customers and vendors.  Doc. Nos. 47-7, 47-8.  Between
February 2011 and December 2012, 655 of the email messages sent
from this account identified Sapatis as the sender, 45
identified Paul as the sender, and an indefinite number of
messages failed to identify a sender.  Doc. No. 36.
Nevertheless, Paul alleges that she is the only person with
access to the account and is the only individual who has ever
sent messages from it.  Doc. No. 47-7.  She explained that she
wrote Sapatis's name on email messages "[b]ecause he has more
knowledge than me, in certain instances.  I don't have a cell
phone.  People can't get ahold of me.  If they are going to call
the office, they would call [Morrow] or him."  Id.

No email message sent or received since 2008 expressly references Coach products, whether authentic or counterfeit.[3] See Doc. No. 47-8.  Nonetheless, Paul responded to a number of messages from customers who expressed a general interest in purchasing counterfeit goods at the Flea Market, including the types of products that Coach manufactures.  For example, on May 16, 2011, a customer asked whether the Flea Market "ha[s] vendors with knockoff purses."  Paul responded later that day that "[t]here are so many sellers / vendors at this flea market & a WIDE selection of items . . . .  You will find MANY bargains - I'd say come & visit, with cash in your pocket!"  Another customer inquired on July 14, 2011 whether "your flea market offer[s] knock off bags."  Later that day, Paul responded that "[t]here are so many items to look at & buy; including handbags / pocketbooks.  You most likely will be satisfied with visiting."[4]  Another customer's email message referenced the "1st 3-4 rows of vendors . . . selling the pocketbooks" – rows

---

[3] In an interrogatory answer, Coach claims that at least one customer sent an email message mentioning Coach products, Doc. No. 42-13, but the alleged message has not been produced.

[4] Paul initially misconstrued the customer's email as an inquiry about selling products as a vendor at the Flea Market.  She first sent the customer a list of vendor policies, including a statement that "illegal & counterfeit items are not allowed." Doc. No. 47-8.

purportedly including the vendors selling counterfeit Coach goods.  Additional messages inquired into whether counterfeit goods imitating other designer brands could be purchased at the Flea Market.  Id.

On June 26, 2011, two private investigators working for Coach inspected the Flea Market, purchased a number of counterfeit Coach products from vendors, and served approximately thirty vendors selling such merchandise with cease and desist letters.  Doc. No. 53-3.  Paul claims that she was working at the concession stand during the inspection and learned of the inspection afterward from Morrow, who had accompanied the investigators.  Doc. No. 42-11.  The investigators returned to inspect the Flea Market on multiple occasions over the next year.  They identified a number of vendors who were selling counterfeit Coach goods during several visits and informed Sapatis of that fact immediately following at least one of the inspections.  Doc. No. 53-3.

On or about August 2, 2011, Paul received a letter from Coach alleging that counterfeit Coach products were being sold by Flea Market vendors and that those responsible for the Flea Market's operations could be held liable if they failed to stop this activity.  Doc. Nos. 36-1, 47-4.  Paul received a similar

letter on or about May 14, 2012.  Doc. No. 36-3, 47-4.  Neither
Paul nor any TABA employee ever communicated with Coach or any
of its representatives prior to Coach suing Paul and TABA in
June 2013.  Doc. No. 36-2.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  An issue is considered genuine if the evidence allows a
reasonable jury to resolve the point in favor of the nonmoving
party, and a fact is considered material if it "is one 'that
might affect the outcome of the suit under the governing law.'"
United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d
200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986)).  In ruling on a motion for
summary judgment, I examine the evidence in the light most
favorable to the nonmoving party.  Navarro v. Pfizer Corp., 261
F.3d 90, 94 (1st Cir. 2001).

The party moving for summary judgment bears the initial
burden of identifying the portions of the record it believes
demonstrate an absence of disputed material facts.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining what constitutes a material fact, "we safely can ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (quoting Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### III.  ANALYSIS

Paul moves for summary judgment on the three remaining counts in Coach's amended complaint: (1) contributory trademark counterfeiting (15 U.S.C. § 1114); (2) contributory trademark infringement (15 U.S.C. § 1114); and (3) contributory copyright infringement (17 U.S.C. § 501).[5]  In a prior order, I discussed the relevant law pertaining to each of these claims.  See Sapatis, 2014 DNH 021, 12-18, 23-25.  To succeed on its claims, Coach must demonstrate that Paul (1) knew or had reason to know of the alleged infringement of Coach's trademarks and copyrights at the Flea Market; (2) exercised sufficient control over the

---

[5] I consider Counts I and II collectively under the more frequently used term "contributory trademark infringement."  See Sapatis, 2014 DNH 021, 11 (citing Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 489 (1984) (Blackmun, J., dissenting)).

vendors engaged in the ongoing infringement;[6] and (3) failed to take sufficient steps to stop it.  See, e.g., 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1254 (10th Cir. 2013); Coach, Inc. v. Goodfellow, 717 F.3d 498, 505 (6th Cir. 2013); Tiffany (NJ), Inc. v. eBay, Inc., 600 F.3d 93, 103 (2d Cir. 2010); see also Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982) ("[I]f a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.").  Here, Paul only

---

[6] This element pertains to a claim for contributory trademark infringement; in contrast, contributory copyright infringement claims employ a "material contribution to the infringing activity" standard.  Sapatis, 2014 DNH 021, 24 (quoting Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996)).  Although the two standards are similar, "[contributory] trademark infringement liability is more narrowly circumscribed than [contributory] copyright infringement."  Id. (quoting Fonovisa, 76 F.3d at 265); accord Sony, 464 U.S. at 439 n.19.  My statement in Sapatis remains true here: "If a reasonable jury could find that [Paul's] actions satisfied the . . . contributory trademark infringement standard, it could similarly find that they satisfied the less stringent 'material contribution' standard for contributory copyright infringement."  See id.  Consequently, my discussion of Coach's contributory trademark infringement claim applies to the contributory copyright infringement claim unless otherwise noted.

attacks the first two elements: her knowledge of, and control over, the infringing activity.[7]

Paul first argues that she cannot be held personally liable because she was acting at all times as a representative of TABA, the corporation that owns and operates the Flea Market.  As Paul sees it, she cannot be held personally liable for contributory infringement because whatever knowledge she obtained or control she exercised in her role as TABA's owner, manager, and sole shareholder may only be imputed to TABA.  She argues in the alternative that, given her status as a corporate officer, she may only be held personally liable for contributory infringement if she was the "moving, active, conscious force who caused the infringement."  See, e.g., Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1478 n.8 (11th Cir. 1991).  Both arguments misstate the relevant law.

## A.    A Corporation's Agents May Be Held Personally Liable For Their Own Conduct

Contributory infringement in the trademark and copyright context is a judicially-created doctrine rooted in basic common law tort principles.  See, e.g., Metro-Goldwyn-Mayer Studios

---

[7] I therefore take no position at this time as to the sufficiency of any remedial steps undertaken by Paul or her associates to stop the infringement.  Cf. Coach, Inc. v. Gata Corp., No. 10-CV-141-LM, 2011 WL 2358671, at *7-10 (D.N.H. June 9, 2011).

Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) ("Although the Copyright Act does not expressly render anyone liable for infringement committed by another, these doctrines of secondary liability emerged from common law principles and are well established in the law." (internal citations, alterations, and quotation marks omitted)); Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992) ("[Defendant] is responsible for the torts of those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously' . . . .  In the absence of any suggestion that a trademark violation should not be treated as a common law tort, we believe that the Inwood Labs. test for contributory liability applies." (quoting Restatement (Second) of Torts § 877(c) & cmt. d (1979)).  Because both the Lanham Act and the Copyright Act are silent as to secondary liability for another's direct infringement, common law tort and agency principles apply.  See, e.g., 1-800 Contacts, 722 F.3d at 1240 (citing AT & T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1433–34 (3d Cir. 1994)) ("[T]he Lanham Act incorporates common-law agency principles.").  These principles clearly indicate that Paul may be held personally liable for contributory infringement, regardless of her relation to TABA.

A corporation can act only through its agents.  Daimler AG
v. Bauman, 134 S. Ct. 746, 759 n.14 (2014).  Consequently,
Paul's claim that TABA's alleged contributory infringement
cannot be imputed to her personally places the cart before the
horse.  If TABA is to be deemed liable for contributory
infringement, it is because it is vicariously liable for the
contributory infringement of its agent(s).  See Restatement
(Third) of Agency § 7.04 (2006) ("A principal is subject to
liability to a third party harmed by an agent's conduct when the
agent's conduct is within the scope of the agent's actual
authority or ratified by the principal; and (1) the agent's
conduct is tortious, or (2) the agent's conduct, if that of the
principal, would subject the principal to tort liability.").
One must consider the personal liability of the corporation's
agent(s) before there is any discussion of the corporation's
liability.

It is true, as Paul argues, that her mere "status as an
officer of a corporation that has allegedly [contributorially]
infringed . . . without more, is not a basis for liability as a
contributory infringer."  See Desmond v. Chi. Boxed Beef
Distribs., Inc., 921 F. Supp. 2d 872, 886 (N.D. Ill. 2013)
(quoting Do It Best Corp. v. Passport Software, Inc., No. 01 C

7674, 2004 WL 1660814, at *15 (N.D. Ill. July 23, 2004)).

Actions taken or knowledge obtained by a corporation via its

agents is not imputed to its officers simply due to their

positions within the corporation.  See, e.g., Arista Records,

Inc. v. Flea World, Inc., No. 03-2670, 2006 WL 842883, at *18

(D.N.J. Mar. 31, 2006) ("[Individual defendants] are not imputed

to enjoy the same knowledge as their corporations, nor are they

presumed to have engaged in the same acts or omissions as their

corporations, merely by their status as corporate officers or

owners.").  But it does not follow that the corporate form

automatically immunizes corporate officers from personal

liability for conduct undertaken on the corporation's behalf.

See Mone v. Dranow, 945 F.2d 306, 308 (9th Cir. 1991)

("[F]ederal common law hold[s] that corporate officers are

personally liable for their torts even if the torts were

committed on behalf of the corporation."); Restatement (Third)

of Agency § 7.01 cmt. d (("[A]n organizational officer is

subject to liability when the officer directly participates in

conduct that constitutes a tort."); see also id. § 7.01 ("Unless

an applicable statute provides otherwise, an actor remains

subject to liability although the actor acts as an agent or an

employee, with actual or apparent authority, or within the scope

of employment."). Paul's personal contributory liability is dependent on her own knowledge and control over the vendors' alleged infringement, regardless of whether her actions or omissions were taken in an official or personal capacity.[8] See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir. 1987) (recognizing that a corporate official may be held personally liable for trademark infringement even though he acted to benefit the corporation).

**B.** **The Same Contributory Liability Standard Applies to All Defendants**

Paul next argues that, even if her individual knowledge and conduct may be considered, she cannot be held personally liable because she was not the "moving, active, conscious force who caused the infringement."[9] To the extent that the test Paul

---

[8] Thus, Coach need not pierce the corporate veil if Paul's own conduct would render her personally liable. See, e.g., Babbit Elecs,, Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil."); Restatement (Third) of Agency § 7.01 cmt. d ("If an organizational officer participates in wrongful conduct, the officer is subject to liability . . . . [I]t is not necessary to 'pierce the corporate veil' or 'disregard the corporation's existence as a separate legal entity' . . . .").

[9] Paul also argues that a corporate officer is only liable for contributory or direct copyright infringement if he or she "knowingly participates" in the infringing activity. See, e.g.,

cites is construed to impose a different standard than that
applicable to any other individual or entity charged with
contributory infringement,[10] I disagree and decline to apply it
here.

Many courts have used the "moving, active, conscious force"
language to analyze a corporate officer's liability for
trademark, copyright, and patent infringement under both direct
and secondary theories of liability.  See, e.g., Chanel, 931
F.2d at 1477-78 & n.8 (direct trademark infringement); Power

Arista Records, 2006 WL 842883, at *17 ("[A]n officer or
director of a corporation who knowingly participates in
[copyright] infringement can be held personally liable, joint
and severally, with the corporate defendant." (second alteration
in original) (quoting Columbia Pictures Indus., Inc. v. Redd
Horne, Inc., 749 F.2d 154, 160 (3d Cir. 1984)); see also 1 Niel
Boorstyn, Boorstyn on Copyright § 10.06[2], at 10-21 (1994)
("[T]he common law doctrine that one who knowingly participates
in or furthers a tortious act is jointly and severally liable
with the prime tortfeasor, is applicable under copyright law.").
To the extent that a "knowing participation" requirement implies
a different standard than that applicable to any other
individual or entity charged with contributory copyright
infringement, I decline to adopt it for the same reasons that I
discuss in the trademark context.

[10] For instance, courts have interpreted the "moving, active,
conscious force" standard to require that a corporate officer
"actively and knowingly caused the infringement."  See, e.g.,
Chanel, 931 F.2d at 1477.  In contrast, an individual or entity
may generally be held liable for contributory infringement if it
fails to act once it has actual knowledge, has reason to know,
or is willfully blind to the fact that it is supplying a service
to one who is engaging in direct trademark infringement.  See,
e.g., Inwood, 456 U.S. at 854; Hard Rock, 955 F.2d at 1149
(citing Restatement (Second) of Torts § 877(c) & cmt. d).

Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 481 (Fed. Cir.
1985) (inducing patent infringement); Int'l Mfg. Co. v. Landon,
Inc., 336 F.2d 723, 728-29 (9th Cir. 1964) (same); Warren v.
John Wiley & Sons, Inc., 952 F. Supp. 2d 610, 618-19 (S.D.N.Y.
2013) (contributory copyright infringement); Microsoft Corp. v.
Suncrest Enter., No. C03-5424 JF (HRL), 2006 WL 1329881, at *7
(N.D. Cal. May 16, 2006) (contributory trademark infringement);
see also Major League Baseball Promotion Corp. v. Colour-Tex,
Inc., 729 F. Supp. 1035, 1043 (D.N.J. 1990) (corporate officer
who was the "conscious, dominant and active force" behind
infringing activity held liable for direct trademark and
copyright infringement).  The standard has also been employed in
at least one analogous flea market case.  Coach Inc. v. Kim's
Management, Inc., No. 1:10-CV-02746-jJOF, slip op. at 36-37
(N.D. Ga. Feb. 28, 2012) (contributory trademark infringement).
Nevertheless, this precedent does not persuade me that the
standard should be applied to Coach's claims against Paul.

     The phrase "moving, active conscious force" first appeared
in Marks v. Polaroid Corp., 237 F.2d 428, 435 (1st Cir. 1956),
which considered whether a corporate officer could be held
liable under the Patent Act for "actively induc[ing]

infringement of a patent."[11]  See 35 U.S.C. § 271(b).  The
standard was adopted by several courts considering § 271(b)
claims over the following three decades before it was first
extended beyond the patent context in Polo Fashions, Inc. v.
Branded Apparel Merch., Inc., 592 F. Supp. 648, 652 (D. Mass.
1984) (holding a corporate officer personally liable for a
corporation's direct trademark infringement).  Without citing to
any section of the Lanham Act, the Polo Fashions court posited
that "[a]lthough a corporate officer is not always individually
liable for torts committed while acting on behalf of the
corporation, if the officer is a 'moving, active conscious force
behind [the defendant corporation's] infringement,' then the
officer will be held personally liable" for trademark
infringement.  Id. (second alteration in original) (quoting
Marks, 237 F.2d at 435).

     The Polo Fashions court failed to provide any explanation
for this statement beyond its citation to Marks.  It also failed
to explain that it was borrowing a standard construing a
specific subsection of the Patent Act for application in the
trademark context, this despite the lack of an analogous

---

[11] Marks was the first case to interpret § 271(b) following
Congress's codification of secondary liability for patent
infringement in 1952.

provision in the Lanham Act.  The omission is particularly

notable given that the statutory provision at issue in Marks

dealt with "active[] induce[ment]" of patent infringement, see

35 U.S.C. § 271(b), rather than a separate Patent Act provision

prohibiting "contributory infringe[ment]."  See 35 U.S.C.

§ 271(c).[12]  Lastly, it failed to acknowledge the Supreme Court's

then recent statement that the "trademark right 'has little or

no analogy' to copyright or patent."  See Sony, 464 U.S. at 439

---

[12] The Supreme Court did not reference - much less rely on - the
Patent Act or cases construing it when it announced its two-
pronged standard for contributory trademark infringement.  See
Inwood, 456 U.S. at 854.  There is nevertheless a notable
similarity between the Inwood trademark standard and the two
subsections of the Patent Act concerning secondary liability for
patent infringement.  Compare id. ("[I]f a manufacturer or
distributor [1] intentionally induces another to infringe a
trademark, or if it [2] continues to supply its product to one
whom it knows or has reason to know is engaging in trademark
infringement, the manufacturer or distributor is
contributorially responsible for any harm done as a result of
the deceit."), with 35 U.S.C. § 271(b) ("Whoever actively
induces infringement of a patent shall be liable as an
infringer."), and id. § 271(c) ("Whoever offers[,] . . .
sells[,] or imports . . . a component of a patented machine . .
. constituting a material part of the invention, knowing the
same to be . . . especially adapted for use in an infringement
of such patent . . . shall be liable as a contributory
infringer.").  Since Marks, courts have applied the "moving,
active conscious force" standard to § 271(b) "active inducement"
claims with some frequency, whereas no court has applied it to a
§ 271(c) "contributory infringement" claim.  But cf. Rohm & Haas
Co. v. Dawson Chem. Co., Inc., 557 F. Supp. 739, 819 (S.D. Tex.
1983) (applying the "moving, active conscious force" standard
without clarifying which provision of the Patent Act it was
relying upon), rev'd sub nom. Rohm & Haas Co. v. Crystal Chem.
Co., 722 F.2d 1556 (Fed. Cir. 1983).

n.19 (quoting United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918)).

Courts following Polo Fashions have continued to apply the "moving, active, conscious force" standard to determine whether a corporate officer is personally liable in trademark (and copyright) infringement claims, generally without explanation beyond citation to prior cases.  Notwithstanding this line of cases – none of which is binding on this court - the application of a unique liability standard to a discreet class of defendants in trademark and copyright infringement cases does not withstand scrutiny.  Contributory trademark and copyright infringement are federal common law doctrines, and there is no common law basis for imposing an alternative tort liability standard based solely on a defendant's status as an agent of an organization.  See, e.g., Restatement (Third) of Agency § 7.01 & cmt. d; Restatement (Second) of Torts § 877(c) & cmt. d.  Consequently, Paul's personal liability for contributory infringement will be judged under the same standard that would apply to any other defendant. See Sapatis, 2014 DNH 021, 14-15 (citing Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984 (9th Cir. 1999); Fonovisa, 76 F.3d at 265; Hard Rock, 955 F.2d at 1148–49) ("[T]he relevant inquiry is . . . whether the defendant had

18

sufficient control over the individuals directly engaging in
[trademark] infringement.").

Accordingly, I first consider Paul's knowledge of the
vendors' alleged trademark and copyright infringement before
determining whether she "had sufficient control over the
individuals directly engaging in" the infringement.

**C.   Paul's Knowledge of the Infringing Activity**

The threshold inquiry is whether Paul knew, or had reason
to know, of particular instances of trademark and copyright
infringement at the Flea Market.  See Goodfellow, 717 F.3d at
503 (citing Inwood, 456 U.S. at 854); see also Sony, 464 U.S. at
487 (Blackmun, J., dissenting) (citing Gershwin Publ'g Corp. v.
Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir.
1971)) ("Contributory infringement has never depended on actual
knowledge of particular instances of infringement; it is
sufficient that the defendant have reason to know that
infringement is taking place.").  Willful blindness of
infringing activity is sufficient to meet this standard.  See,
e.g., Goodfellow, 717 F.3d at 503 (citing Hard Rock, 955 F.2d at
1149) ("[A] flea market operator who deliberately fails to
investigate suspected infringing activity by vendors . . . may
be subject to contributory liability."); Luvdarts, LLC v. AT & T

19

Mobility, LLC, 710 F.3d 1068, 1073 (9th Cir. 2013) (citing

Global-Tech Appliances, Inc. v. SEB S.A., 131 S. Ct. 2060, 2070

(2011)) ("In order to allege willful blindness, [plaintiff] must

allege that [defendants] (1) subjectively believed that

infringement was likely occurring . . . and that they (2) took

deliberate actions to avoid learning about the infringement.").

A reasonable jury could certainly find that Paul had

sufficient knowledge of specific acts of trademark infringement

at the Flea Market as of June 26, 2011, if not earlier.  On that

date, Morrow accompanied two private investigators hired by

Coach as they inspected the Flea Market and served cease and

desist letters to approximately thirty vendors selling

counterfeit Coach products.  Paul was present at the Flea Market

and aware of the inspection as it was occurring.  She learned

from Morrow soon afterward that some vendors had been issued the

letters for selling counterfeit Coach products and that these

vendors had been asked to leave the Flea Market.

Paul testified that following the inspection, "I didn't go

up there and [personally] tell [the identified vendors to

leave], because I don't know who they are." Doc. No. 42-11.

But after her conversation with Morrow - a TABA employee

reporting directly to Paul with firsthand knowledge of the

infringing vendors' identities - Paul clearly had reason to know
of particular instances of alleged infringement by particular
vendors.  Paul was ultimately responsible for all aspects of the
Flea Market's operations, including its anti-counterfeiting
efforts; if she neglected to ask Morrow to identify the relevant
vendors or failed to personally investigate the matter further,
she was likely willfully blind to the vendors' unlawful conduct.
See, e.g., UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993,
1000 (E.D. Cal. 2004).  Accordingly, Paul cannot credibly claim
that she lacked sufficient knowledge of the alleged trademark
infringement.[13]

**D.    Paul's Control Over Vendors and Contribution to Their Infringement**

Paul next argues that she did not "continue[] to supply
[services]" to vendors whom she knew or had reason to know were
infringing Coach's trademarks because she did not exercise
"sufficient control over the individuals directly engaging in

_____

[13] It is unclear whether Morrow or Paul was aware that vendors
were allegedly infringing Coach's copyrights as well as their
trademarks at the time of the June 26 inspection.  The first
letter Paul received from Coach on August 2, 2011 only
references trademark infringement.  Doc. No. 36-1.  However, the
second letter that Paul received from Coach on or about May 14,
2012 alleges ongoing copyright infringement at the Flea Market.
Doc. No. 36-3.  This second letter was sufficient to put Paul on
notice of the vendors' alleged copyright infringement, at least
as of this later date.

[the] infringement." See Inwood, 456 U.S. at 854; Sapatis, 2014
DNH 021, 14-15. I disagree.

Paul's responsibilities and conduct at the Flea Market
permit a reasonable inference that she "had sufficient control
over the individuals directly engaging in [trademark]
infringement." See Sapatis, 2014 DNH 021, 14-15. Despite her
typical presence at the Flea Market's concession stand, Paul was
in close proximity to the infringing vendors every day that the
Flea Market was open. She clearly had the right and ability to
police their conduct. Cf. Perfect 10, Inc. v. Amazon.com, Inc.,
508 F.3d 1146, 1174 (9th Cir. 2007) (noting the significance in
Fonovisa that the defendant "had the ability to identify and
police infringing activity by patrolling its premises"); Gata,
2011 WL 2358671, at *7 ("The issue of proximity [between the
defendant and the infringing vendors] . . . is related to the
issue of control, which is a key component of the analysis.").
Although Paul delegated many tasks to others, she actively
checked vendors in, assigned their spaces, verified their
compliance with policies she had helped to create, and received
their suggestions.

Most importantly, TABA leased the space and provided the
support services necessary for vendors to allegedly sell

22

counterfeit Coach goods at the Flea Market.  Cf. Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 799 (9th Cir. 2007) ("The swap meet operator in Fonovisa . . . increased the level of infringement by providing a centralized place . . . where infringing works could be collected, sorted, found, and bought, sold, or exchanged."); Fonovisa, 76 F.3d at 264 ("[I]t would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market].  These services include, inter alia, the provision of space, utilities, parking, advertising, plumbing, and customers.").  As the owner, manager, and sole member of TABA, Paul bound TABA to contracts with third parties, see, e.g., Doc. No. 30-5, and was ultimately responsible for the decision to enter into, terminate, or refrain from terminating vendors' lease agreements.  See, e.g., Doc. No. 36-5 ("Counterfeit . . . items are not to be brought/sold at the flea market. . . .  Management . . . reserves the right to refuse admission to any vendor . . . at any time.").

A jury could reasonably infer based on these facts that Paul had the right and ability to exercise "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark" and "to remove infringing

23

material . . . or directly stop their distribution" at the Flea Market.  See Visa Int'l, 494 F.3d at 807 (quoting Lockheed Martin, 194 F.3d at 984).  This is sufficient to render Paul potentially liable for contributory infringement.  See Sapatis, 2014 DNH 021, 14-18, 23-25.


### IV.   CONCLUSION

For the reasons discussed above, I deny the motion for summary judgment.[14] (Doc. No. 42).

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


June 23, 2014

cc:   Erin Corbally, Esq.
      Jeffrey K. Techentin, Esq.
      Kyle Zambarano, Esq.
      Lisa Snow Wade, Esq.
      Robert S. Carey, Esq.
      Jeremy T. Walker, Esq.
      Nicholas F. Casolaro, Esq.

---

[14] TABA has also moved for summary judgment with respect to Coach's state law unfair competition claim.  Doc. No. 42.  Coach has since waived that claim with respect to both TABA and Paul. Doc. No. 47-1.  Consequently, I deny TABA's motion as moot.