UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Coach, Inc., et al.**

  **v.**          Civil No. 12-cv-506-PB
                  Opinion No. 2014 DNH 149
**Peter J. Sapatis, et al.**


**MEMORANDUM AND ORDER**


   This case arises from the sale of counterfeit goods by third party vendors at a flea market in Londonderry, New Hampshire.  Coach, Inc. and Coach Services, Inc.,[1] purveyors of designer handbags and other personal goods, have sued Peter J. Sapatis, Londonderry Marketplace, LLC, Alaina E. Paul, and TABA Enterprises, LLC, seeking injunctive relief and damages for alleged violations of federal trademark and copyright law. Coach has moved for a prejudgment writ of attachment to secure real property owned by Sapatis pending trial.  I deny the motion.


## I. BACKGROUND

   A detailed background of this case is provided in two previous orders, Coach, Inc. v. Sapatis (Sapatis I), 2014 DNH

---

[1] Coach, Inc. and Coach Services, Inc. have referred to themselves collectively as "Coach" throughout the pleadings.  I follow their lead here.

021 and Coach, Inc. v. Sapatis (Sapatis II), 2014 DNH 140.  I
thus limit my discussion to facts relevant to the instant
motion.

On June 26, 2011, two private investigators working for
Coach, Andrea Powers and Michael Surette, arrived at the
Londonderry Flea Market and informed Sapatis that the Flea
Market's vendors were selling counterfeit Coach products.  Doc.
No. 36-4.  Sapatis sent for one of the off-duty, uniformed
Londonderry police officers retained by TABA to patrol the
grounds as well as a TABA employee, Linda Morrow, who each
accompanied Powers and Surette while they inspected the Flea
Market.  Id.  Powers noted that "30 vendor locations were
observed offering counterfeit Coach merchandise for sale. . . .
in plain view."[2]  Doc. No. 53-3.  The investigators purchased six
such items from various vendors.  Id.  They later reported to
Coach that Sapatis had "agreed to all of our requests . . . .
and appreciated us dealing with [the vendors] directly to
resolve this issue. . . .  [Sapatis was] very accommodating to
this service."  Doc. No. 53-3; see Doc. No. 50-3 ("[Sapatis]

---

[2] During subsequent visits to the Flea Market, Coach's
investigators - who were also hired by other brand owners to
investigate possible counterfeit sales of their products - noted
that vendors were also selling counterfeit merchandise bearing
the trademarks and copyrighted material of several other brands.
Doc. No. 53-3.

asked if we could help in any way . . . .  I offered several types of services to [him]. . . .  I offered to walk him through his market and point out the vendors who were selling counterfeit items.  I offered to provide him with specific language that he could put in his vendor agreements. . . .  I offered him free training to law enforcement so they could identify product[s] and help [him].").

Following the inspection, Powers gave Morrow copies of a letter prohibiting the sale of counterfeit goods that had been translated into Mandarin.[3] Doc. No. 36-4.  Morrow distributed this letter to all vendors, and Sapatis later called Powers to ask for additional copies of the letter so that he could distribute it to the vendors a second time.  Id.  Morrow informed the investigators "that she would . . . instruct [the thirty identified vendors] to pack-up and leave the market." Doc. No. 53-3.  Paul later testified that Morrow had in fact "kick[ed] them out" of the Flea Market.  Doc. No. 42-11.

On August 2, 2011, Coach sent a letter to the Flea Market alleging that counterfeit Coach products were being sold by its vendors and that those responsible for the Flea Market could be held liable if they failed to stop this unlawful activity.  Doc.

---

[3] The parties agree that most of the allegedly infringing vendors were of Asian ancestry.  See Doc. Nos. 42-11, 42-12, 53-3.

No. 36-1. Sapatis received this letter and attempted to contact Coach's counsel to seek assistance in complying with its instructions, although he is unsure whether he spoke with a representative of Coach. Doc. No. 36-4.

On August 13, 2011, the investigators returned and noted that a sign had been posted at the sole entrance to the Flea Market stating "vendors, you are not allowed to sell counterfeit or any illegal items on these premises."[4] Doc. No. 53-3. The investigators informed Coach that "[t]he rows of vendors whom [sic] were served with [cease and desist] letters during our previous visit seemed smaller. . . . Approximately 10 vendors were observed displaying [Coach] products. . . . where [the] letters were previously served on your behalf."[5] Id. The most prominent of these vendors was "displaying approximately 3 dozen [counterfeit Coach] items." Id. The investigators explained that "[o]ther booths in this row did not display counterfeit

---

[4] The sign was also noted during the investigators' subsequent inspections of the Flea Market. Doc. Nos. 53-3, 70-1.

[5] The investigators noted that the vendors allegedly selling counterfeit Coach goods were located in the same area of the Flea Market during each inspection. Doc. No. 53-3. Sapatis later testified that these vendors had requested to be placed together "mainly because of the language barrier." Doc. No. 53-8.

Coach items in plain view . . . .  [and w]hen asked about Coach products, each vendor replied 'no.'"  Id.

In September 2011, Sapatis called Surette and offered to pay him to conduct another inspection.  Doc. No. 36-4.  Later that month, Powers sent an email message to Coach and certain other unidentified brand owners in which she reported that Sapatis had informed her that he "wants to work with us to keep these vendors in line[,] . . . requested copies of the NH anti-counterfeiting law[6] in both English and Mandarin to hand out to . . . vendors[, and] . . .  asked if we could walk around the flea market and identify any vendors currently selling counterfeit items."  Doc. Nos. 68-2, 70-1.  Powers stated that Sapatis had also asked her if she could "'provide [him] with copies of the trademarks,' and I told him I would do that."[7]

---

[6] Sapatis was presumably referring to section 350-A:11 of the New Hampshire Revised Statutes, the state law analog to 15 U.S.C. § 1114.

[7] Sapatis testified that he "didn't know Coach's trademarks. It's a matter of being educated, and . . . I never saw the word 'Coach' on anything . . . ."  Doc. No. 42-12; see also Doc. No. 47-9 ("[Sapatis] has never purchased a Coach product, nor been given one as a gift.  He is not familiar with their trademarks.").  He noted that some of TABA's employees were "familiar with Coach. . . . [but] never brought to our attention . . . [that] they ha[d] seen anything with Coach or resembling Coach."  Doc. No. 42-12.  When others later pointed Coach products out to him, Sapatis stated that he "couldn't tell the difference between authentic or counterfeit, especially when

Doc. No. 68-2.  Per Sapatis's request, Powers presented the

following proposal to the brand owners that had hired her firm

to investigate the Flea Market:

> Trip #1:  .  .  .  survey the Londonderry Flea Market,
> identify the vendors selling counterfeits to Mr.
> Sepatis [sic], and provide him with a copy of the NH
> anti-counterfeiting law.  Mr. Sepatis [sic] will then
> give these vendors a verbal warning and ask that they
> leave the market.  The vendors are not allowed to
> return to the market if they continue to sell the
> counterfeit items.  We will also provide Mr. Sepatis
> [sic] with copies of your trademarks as reference
> materials.
>
> Trip #2: complete a compliance check and regroup with
> Mr. Sepatis [sic].  A detailed report will be sent to
> you at the end of the compliance check.

Doc. No. 70-1.

Coach did not accept this proposal, Doc. No. 51-2, but one

unidentified brand owner authorized Powers's firm to begin

working with Sapatis.  Doc. No. 70-1.  Sapatis agreed to meet

with one of the firm's investigators to "walk the market to be

educated on the vendors selling the counterfeit items."  Id.  He

subsequently met with Surette on September 28, 2011.  They

discussed the alleged counterfeiting and Sapatis requested and

received a copy of the New Hampshire counterfeiting law printed

in English and Mandarin.  Id.

---

they tell you these are used, these are real.  How are we ever
going to know?"  Id.

Surette returned to inspect the Flea Market, without
payment from Sapatis, on October 9, 2011.  Sapatis testified
that he was disappointed that Surette completed the inspection
without him, but the two subsequently spent fifteen to twenty
minutes touring the Flea Market together.  Doc. No. 36-4.
Surette reported that "[t]he number of counterfeit items for
sale in plain view in this market has been drastically reduced
and nearly 100% eliminated," explaining to Sapatis that the Flea
Market was "clean, but not to say that you're going to stay
th[at] way."  Doc. Nos. 36-4, 70-1.  Sapatis informed Surette
that he had distributed copies of the counterfeiting law to the
vendors and informed them that he would not tolerate further
sales of counterfeit goods.  Doc. No. 70-1.  According to
Surette, these actions "had a big impact on the items these
vendors had out for sale."  Id.  Sapatis also informed Surette
that he had considered banning all Asian vendors, but was
concerned about possible legal consequences arising from any
action taken on the basis of ethnicity.  Id.  Surette concluded:

> Sepatis [sic] is . . . eager and willing to work with
> myself or anyone else to combat the sale of
> counterfeit property in his market. . . .
>     I believe Mr. Sepatis [sic] is being genuine in
> his willingness to work with any brand name
> representatives or law enforcement . . . .  I do
> believe that if the Asian vendors travelling to the
> market from NY state continue to do business at this

> market the sale of counterfeit property will never be
> eliminated completely and will require regular
> monitoring.

Id.

In a letter dated November 9, 2011 to a recipient whose identity has been redacted, Powers summarized Surette's inspection of the Flea Market on October 9th.  Id.  Powers reported that "no vendors were observed offering products bearing your trademarks" either during that inspection or a compliance check on October 22, 2011.  Id.  The same day, Powers sent a letter to Sapatis on behalf of twelve brand owners that included examples of their trademarks for Sapatis's reference.  Doc. Nos. 36-7, 70-1.  The letter was not sent on behalf of Coach and did not include any examples of Coach's trademarks.  See Doc. No. 36-7.

On April 29, 2012, another private investigator employed by Powers's firm, Ralph Shalsi, visited the Flea Market and observed five vendors selling at least seventeen counterfeit Coach items, some openly displayed and some hidden under the vendors' tables.  Doc. No. 53-3.  Shalsi returned to inspect the Flea Market on May 5, May 13, and May 20, 2012.  Doc. No. 70-1.  On at least one of these occasions, Shalsi observed a vendor "display[ing] small amounts of counterfeit products [so] as not

8

to bring attention to herself by the owners.  Most of her
counterfeit items are stored beneath her tables and inside of
her vehicles."  Id.  It is unclear if Shalsi observed
counterfeit Coach goods during these three visits.  Id.

On May 14, 2012, Coach mailed another letter to the Flea
Market that was similar in content to the August 2nd letter.
Doc. No. 36-3.  In response, Sapatis called Ethan Lau, Coach's
counsel, seeking "help in taking care of this counterfeiting
problem."  Doc. No. 36-4.  Lau testified that Sapatis had
informed him "that he is willing to help us to stop counterfeit
activity in the flea market, and if we come across any
information that people are selling counterfeit [sic] at the
flea market, let him know."  Doc. No. 51-2.  He noted that
Sapatis had not asked for any specific training from Coach and
that Coach would have declined to train him even if he had, as
"Coach does not educate and assist flea markets or other
businesses in identify [sic] vendors selling counterfeit Coach
products."  Doc. No. 42-13; see Doc. No. 51-2 ("[W]e only train
our private investigators. . . . [and] law enforcement agencies.
. . . with the understanding that all the information is
proprietary and confidential and not to be disclosed.").[8]

---

[8] When asked why Coach maintains this policy, Lau explained that

On October 21, 2012, investigator Shalsi returned to the Flea Market, observed "[a]pproximately 12 vendors . . . offering counterfeit Coach merchandise for sale. . . . in plain view," and purchased six counterfeit Coach products from various vendors. Doc. No. 53-3. He noted that a police officer was walking around the Flea Market during his inspection. Id. During this visit, Shalsi did not recognize any of the same vendors from his prior inspection of the Flea Market in April 2012. Doc. No. 65-3.

Shalsi returned to inspect the Flea Market five or six more times in 2012. Doc. No. 50-4. On two of those occasions, he did not see any indication of counterfeit sales. Id. On the other occasions, Shalsi noted the presence of counterfeit goods bearing the trademarks and copyrighted material of brands other than Coach, but could not recollect whether vendors were selling counterfeit Coach goods. Id.

Since at least 2010, Sapatis has collaborated with Paul and Morrow to develop annual vendor policy statements including this provision: "Counterfeit . . . items are not to be brought/sold

─────────────────────────────

"I have my suspicions that [defendants] are working with the vendors, and it doesn't make any sense to teach them the specific method or methods of how to identify counterfeit goods, because if this information ultimately goes to the vendors, they can make a better fix and undermine my entire operation." Doc. No. 51-2.

at the flea market. . . .   Management . . . reserves the right

to refuse admission to any vendor . . . at any time." Doc. No.

36-5; see Doc. No. 42-2.  Paul testified that throughout 2011

and 2012, Sapatis frequently sought the assistance of a police

officer upon discovering problems with vendors such as

counterfeiting. Doc. Nos. 36-4, 53-7.  In turn, Sapatis noted

that Paul used the trademark examples sent by Powers to help her

identify counterfeit goods. Doc. No. 42-12.

    Sapatis, Paul, Morrow, various police officers, and other

individuals affiliated with the Flea Market contributed to a log

book documenting their frequent patrols of the Flea Market

grounds. Doc. No. 36-6.  The log book repeatedly references

designer brands, including Coach.[9]  Id.  Sapatis testified that

---

[9] Log book entries referencing potential counterfeiting during
the relevant period are as follows:

> [Morrow] saw several plaid scarves made of cashmere –
> will ck w Burberry paperwork.  Most scarves plain or
> designs. . . . [Paul] . . . saw a vendor selling Polo
> & Lacoste . . . [Sapatis] went to speak w/ him – I
> went by @ 2pm – vendor has store in Manchester – will
> bring licenses to sell – nx wk. . . .  Both Qui & Yang
> packed & gone. . . .   Saw vendor slide pocketbook
> under arm then put it under bag on table – Spoke to
> [Sapatis] – He must leave (Yu Yang).  2 other vendors
> left on their own.  Were not here 8/10 or 8/11
> (Shenghai Chen, J. Jiang). . . .   Report of Oakley
> glasses not found.   Found 1 Rayban box. . . .
> Removed. . . . [Morrow] watched a . . . vendor sell
> bags try to hide them when he saw me.  Approached him

he, Paul, or Morrow would brief the police officers about current counterfeiting concerns prior to their patrols.  Doc. No. 42-12.  When vendors were caught selling potentially counterfeit items, they were told to leave or, on some occasions, to remove the offending products.  Doc. Nos. 36-6; 42-12.

---

& told him he would need to be out by next Sat (Qu). . . . .  [Morrow] picked-up boxes & bags in pocketbook area.  (1) bag fell out of a box – Found MK tissues & Gucci tags – Called vendor – Told him he must pack & be gone on 8/3 (Chayu Yang). . . . .  Looked for Oakley glasses.  None found. . . .  Vendor reported selling cologne from back of stand.  Inspected – selling.  Asked to pack & leave.  Joe Chen. . . .  Notified vendor no MK or Michael Kors – Had gone online to see that only cosmetics were not under trademark due to lawsuit – Our mistake – Told vendors to remove all MK. . . .  pulled (1) pair Rayban (1) MK bag. . . .  3 items found. . . 1 MK clutch.  1 MK bag 1 MK clutch 1 bag colors only of Coach.  Vendor told last time – Put on warning – Chanyen Yang. . . .  Officer Doyle found a vendor selling Coach wallets & Rolex watches – Management asked vendor to pack-up & leave – Song Yechen. . . .  Customer came to main gate – vendor selling Coach – went to investigate – no Coach products found. . . .  Customer said vendor selling Coach – unable to find any Coach items. . . .  [Sapatis] feels same customer as Sat. . . .  2 vendors selling asked to leave – (1) selling Chanel, Vuitton (Song).  (2) I-Pad covers, phone covers, etc.  All trademarked (new vendor) Chen. . . . .  Officer Doyle clear w/ everyone re: trademarks.

Doc. No. 36-6.

12

## II.  <u>STANDARD OF REVIEW</u>

Federal courts apply the law of the forum state to determine whether to grant a prejudgment attachment.  Malone v. Cemetery St. Dev., Inc., No. 94-339-B, 1995 WL 85288, at *7 (D.N.H. Feb. 17, 1995) (citing Fed. R. Civ. P. 64; Diane Holly Corp. v. Bruno & Stillman Yacht Co., 559 F. Supp. 559, 560 (D.N.H. 1983)).  "In New Hampshire, prejudgment attachments may be granted only after notice to the defendant, and upon defendant's objection, following a hearing."[10]  Id. (citing N.H. Rev. Stat. Ann. § 511-A:2 to :3).  First, "the burden shall be upon the plaintiff to show that there is a reasonable likelihood

---

[10] Although section 511-A:3 generally mandates a hearing once the defendant objects to a motion to attach - as Sapatis has here – the parties have briefed the relevant issues and neither has requested a hearing.  Section 511-A:3's hearing requirement, its heightened evidentiary standard, and its burden shifting framework are all procedural protections primarily intended to safeguard the defendant's "constitutionally protected property interests."  See Diane Holly Corp., 559 F. Supp. at 560-61 (courts should "[c]onstru[e section 511-A:3] narrowly in light of the special protections afforded property interests in this state").  Because I have concluded on the pleadings that Coach is clearly not entitled to the relief it seeks, a hearing is not necessary to safeguard Sapatis's rights in his property.  Cf. Chagnon Lumber Co., Inc. v. Stone Mill Constr. Corp., 124 N.H. 820, 822 (1984) ("RSA chapter 511-A['s] . . . . most obvious feature is its provision for notice and hearing before property interests can be encumbered by a pre-judgment attachment." (emphasis added)); Hampton Nat'l Bank v. Desjardins, 114 N.H. 68, 70 (1974) ("[Chapter 511-A] require[s] a plaintiff to give to a defendant . . . an opportunity for a preliminary hearing before the attachment is made." (emphasis added)).

that the plaintiff will recover judgment . . . on any amount equal to or greater than the amount of the attachment." N.H. Rev. Stat. Ann. § 511-A:3.  If this burden is met, "the plaintiff shall be entitled to the attachment unless the defendant establishes . . . that his assets will be sufficient to satisfy such judgment . . . ."  Id.

The "reasonable likelihood" standard falls between a preponderance of the evidence and proof beyond a reasonable doubt.  See Avery v. Hughes, No. 09-CV-265-JD, 2010 WL 338092, at *2 (D.N.H. Jan. 20, 2010) (citing Chi Shun Hua Steel Co. v. Crest Tankers, Inc., 708 F. Supp. 18, 25 (D.N.H. 1989)).  It demands that a plaintiff "make a strong preliminary showing that he or she will ultimately prevail on the merits and obtain judgment in the requested amount."  Id. (quoting Diane Holly Corp., 559 F. Supp. at 561)); see Gembitsky v. DeSteph, No. 09-CV-140-JM, 2009 WL 1273770, at *4 (D.N.H. May 7, 2009) (describing the plaintiff's burden as "pro[of] by clear and convincing evidence").

### III.  **ANALYSIS**

To obtain a pre-judgment attachment, Coach must make "a strong preliminary showing" that it satisfies each element of

14

its contributory infringement claims against Sapatis.  See Diane
Holly Corp., 559 F. Supp. at 561.  Specifically, Coach must
prove that Sapatis "(1) knew or had reason to know of the
alleged infringement of Coach's trademarks and copyrights at the
Flea Market; (2) exercised sufficient control over the vendors
engaged in the ongoing infringement; and (3) failed to take
sufficient steps to stop it."[11]  See Sapatis II, 2014 DNH 140, 7-
8 & n.6 (citing Sony Corp. of Am. v. Universal City Studios,
Inc., 464 U.S. 417, 489 (1984); Inwood Labs., Inc. v. Ives
Labs., Inc., 456 U.S. 844, 854 (1982); Coach, Inc. v.
Goodfellow, 717 F.3d 498, 505 (6th Cir. 2013)).  I conclude that
Coach has failed to meet its burden with respect to the third
element.[12]

---

[11] As a threshold matter, Coach must also prove that certain
vendors at the Flea Market directly infringed Coach's trademarks
or copyrights.  See, e.g., Suntree Techs., Inc. v. Ecosense
Int'l, Inc., 693 F.3d 1338, 1345–46 (11th Cir. 2012) ("To
demonstrate that [defendants] were contributory infringers,
Suntree was required to present evidence that [a third party]
directly infringed on its mark.").

[12] Coach relies heavily on my earlier denial of Sapatis's motion
for summary judgment, but that decision dealt only with the
second element of Coach's contributory infringement claims.  See
Sapatis I, 2014 DNH 021, 12 n.4 ("For purposes of this motion .
. . the parties dispute only Sapatis's degree of control over
the Flea Market and its vendors, not . . . his notice of the
vendors' infringing conduct and the sufficiency of any steps
taken to stop it.  I take no position concerning the latter
issues at this time." (citation omitted)).  It provides no

Coach claims that "Sapatis continued to freely allow the sales of Counterfeit Products on Flea Market premises" and that his efforts to prevent the sale of counterfeit Coach products were "token, transparently designed more for the appearance than the actual prevention of knock-off sales."[13]  Doc. No. 53-1.  I disagree.  Sapatis took a number of reasonable steps following the first inspection that even Coach's own investigators felt were undertaken in good faith and genuinely designed to prevent the sale of counterfeit goods.

For example, Sapatis repeatedly reached out to the investigators, Coach's counsel, and law enforcement to seek

support to Coach with respect to the third element, which I find to be dispositive.

[13] The only evidentiary support for these otherwise conclusory allegations is six messages sent from the Flea Market's email account, two bearing Sapatis's name, that purportedly "promote the sales of Counterfeit [Coach] Products."  See Doc. No. 53-1. Both Sapatis and Paul testified that Paul was the only individual with access to the account and that she signed Sapatis's name to certain messages because "I don't have a cell phone.  People can't get ahold of me.  If they are going to call the office, they would call . . . him."  Doc. No. 65-1; see Doc. No. 65-2.  It is difficult to square Coach's prior concession based on this testimony "that Sapatis did not read and send e-mails from the [Flea Market's] e-mail account," see Doc. No. 47-1, with its current allegation that Sapatis "was the individual who sent these emails."  See Doc. No. 53-1.  Regardless, the messages - none of which expressly mention Coach or the presence of counterfeit goods at the Flea Market – are insufficient to demonstrate a "strong preliminary showing" of Coach's ultimate success on the merits.  See Diane Holly Corp., 559 F. Supp. at 561.

assistance in preventing the sale of counterfeit goods.  Doc.
Nos. 34, 36-4, 50-3, 51-2, 53-3, 53-7, 68-2; see Doc. No. 70-1
("I believe Mr. Sepatis [sic] is being genuine in his
willingness to . . . combat[] this issue.").  He requested that
Powers send him copies of the trademarks allegedly being
infringed in order to learn to identify Coach's products.[14]  Doc.

---

[14]     Although other brand owners working with the investigators
agreed to provide Sapatis with copies of their trademarks, see
Doc. Nos. 36-7, 70-1, Coach did not.  Doc. No. 51-2.  According
to Coach, "whether (and how) Coach engages in assisting
Defendants and their personnel in identifying Coach products
will have no bearing on Defendants' liability to Coach."  Doc.
No. 42-13.  I disagree.
     First, the willingness of twelve brand owners to provide
copies of their trademarks to Sapatis is evidence of the
reasonableness of his request.  See Doc. Nos. 36-7, 70-1.  Even
assuming that training flea market operators on "specific . . .
methods . . . to identify counterfeit goods" would ultimately
help vendors "make a better fix and undermine [a brand owner's]
entire operation," see Doc. No. 51-2, simply distributing copies
of trademarks would not reasonably be expected to do so.
     Second, it is difficult to understand how Sapatis could be
expected to successfully identify counterfeit Coach products
without, as he claims, "know[ing] Coach's trademarks."  See Doc.
No. 42-12.  One of Coach's own investigators testified that he
was unable to distinguish counterfeit from authentic goods.  See
Doc. No. 51-3 ("I'm not able to authenticate anything, so what
could be counterfeit or not counterfeit, I can't – I don't
decipher that.").  Lau concedes that familiarity with Coach's
trademarks is an important prerequisite to successfully
identifying counterfeit Coach goods.  See Doc. No. 51-2 ("We
actually go out and train [law enforcement] on how to identify
counterfeit products. . . . [including t]rademarks . . . .
[because] it's important for the . . . officials to have some
understanding of Coach's products and trademarks when they're
investigating . . . .  I actually had a one-on-one with [Powers]
. . . . to help her to . . . pick out our brand to identify

Nos. 42-12, 68-2.  On multiple occasions, Sapatis distributed bilingual anti-counterfeiting literature to vendors and informed them that counterfeit sales would not be tolerated.  Doc. Nos. 36-4, 68-2, 70-1.  He worked with Paul and Morrow to develop vendor policies prohibiting the sale of counterfeit products. Doc. No. 36-5, 42-2.  Sapatis and others associated with the Flea Market briefed police officers on recent counterfeiting developments prior to the officers patrolling the grounds.  Doc. Nos. 42-12.  Sapatis patrolled the premises as well, logging instances of possible counterfeiting and noting the corrective action taken.  Doc. No. 36-6.  Vendors identified as selling counterfeit Coach products were generally evicted, although at times they were told to remove the offending goods.  Doc. Nos. 36-6, 42-11.  Sapatis also considered a more draconian measure - banning vendors on the basis of their national origin - but ultimately rejected it.[15]  Doc. Nos. 70-1.

_____

products.").  Coach's claim that Sapatis "should not need help identifying the sale of hundreds of counterfeit designer handbags . . . . [because i]t is obvious that these are counterfeit sales," see Doc. No. 42-13, is seriously undermined by the importance Coach places on providing such help to law enforcement and its own investigators.

[15] In an indication of the difficulty of the task, Surette opined that to completely halt the sale of counterfeit goods, Sapatis would have to bar an entire class of Asian vendors from the Flea Market.  See Doc. No. 70-1; cf. 1-800 Contacts, Inc. v.

Contributory infringement doctrine does not impose a strict liability standard, and Coach has failed to demonstrate that Sapatis did not take "reasonable remedial measures" to prevent known infringers from continuing to use the Flea Market's services to infringe.  See 1-800 Contacts, 722 F.3d at 1249, 1252 (citing Inwood, 456 U.S. at 853-54; Goodfellow, 717 F.3d at 505) (defendant must "make reasonable efforts to halt the" infringement once he or she knows or has reason to know of it); Goodfellow, 717 F.3d at 505 (noting that a defendant must "undertak[e] a reasonable investigation or tak[e] other appropriate remedial measures" to avoid contributory liability).

By way of comparison, the Second Circuit in Tiffany (NJ) Inc. v. eBay Inc. held that eBay had taken reasonable remedial measures to halt sellers' infringement of Tiffany's trademarks on its site by investing heavily in fraud prevention efforts, maintaining a strong anti-counterfeiting policy, permitting trademark holders to screen suspicious listings before they were published, utilizing a program to search for and delete infringing listings within twelve hours, and suspending many

---

Lens.com, Inc., 722 F.3d 1229, 1253-54 (10th Cir. 2013) ("[T]he plaintiff did not describe any way for the defendant to stop an unidentified infringer without also interfering with legitimate [activity] . . . .  A defendant has no obligation under contributory-infringement doctrine to stop a practice . . . simply because the practice might be exploited by infringers.").

suspected infringers.  600 F.3d 93, 98–100 (2d Cir. 2010); <u>see</u>
<u>also</u> 1-800 Contacts, 722 F.3d at 1254 (noting that a single
remedial measure - "ordering an email blast that would
necessarily reach the publisher and stop the . . . [infringement
without] interfer[ing] with any lawful conduct of other
affiliates" – would be sufficient under the circumstances).  In
contrast, the Sixth Circuit in <u>Goodfellow</u> held that a flea
market operator had not taken sufficient action when he failed
to train employees to identify counterfeit goods, exclude known
infringing vendors, inspect vendors' goods or question their
authenticity, ask vendors if they were licensed to sell Coach
products, or require vendors to agree not to sell counterfeit
products.  717 F.3d at 504-05.  The few steps taken by the
defendant in that case - distributing anti-counterfeiting
pamphlets at random, posting an anti-counterfeiting sign
targeting counterfeit currency rather than counterfeit goods,
and holding a poorly-attended meeting with vendors that was
rendered ineffective by language barriers – were not a
reasonable response to the ongoing blatant sale of counterfeit
goods at the market.  <u>Id.</u>; <u>see also</u> Coach, Inc. v. Gata Corp.,
10-CV-141-LM, 2011 WL 2358671, at *10 (D.N.H. June 9, 2011)
(holding a flea market operator liable for contributory

20

infringement when it posted a sign stating that counterfeit sales were prohibited, yet failed to inspect vendors' merchandise or vehicles prior to the vendors setting up, failed to train employees conducting walk-throughs of the flea market on how to detect counterfeit merchandise, counseled at least one vendor on how to hide counterfeit merchandise, and confiscated counterfeit goods without evicting a single vendor, in contravention of the flea market's own policies).

Sapatis's efforts to combat the sale of counterfeit Coach merchandise more closely resemble the reasonable remedial measures deemed sufficient in Tiffany than the insufficient steps taken in Goodfellow.  Moreover, even assuming Coach is correct that "[t]o constitute reasonable efforts, Sapatis's actions must at a minimum have discouraged the sale of Counterfeit [Coach] Products," see Doc. No. 53-1, it is far from clear that Sapatis's actions did not have exactly that effect. The number of allegedly infringing vendors reported by Coach's investigators generally declined over time.  Doc. Nos. 53-3 (noting thirty offending vendors on June 26, 2011, ten vendors on August 13, 2011, and five vendors on April 29, 2012), 70-1 (noting no offending vendors on October 9, 2011), 50-4 (noting no offending vendors on at least two other unspecified dates in

2012).  Over time, the investigators noted that vendors began hiding counterfeit Coach goods to avoid drawing the management's attention and responded "no" when asked about such goods.  Doc. No. 53-3.  One investigator noted that "[t]he number of counterfeit items for sale in plain view in this market has been drastically reduced and nearly 100% eliminated. . . . [Sapatis's actions] had a big impact on the items these vendors had out for sale."  Doc. No. 70-1.  Although more offending vendors were identified during an inspection in October 2012 than had been identified during a prior inspection in April, see Doc. No. 53-3, one investigator present during both inspections reported that he did not recognize any of the same vendors. Doc. No. 65-3.  Given the investigators' positive assessment of Sapatis's efforts, the declining trend in the number of vendors identified as selling counterfeit Coach products, the increasingly clandestine nature of the vendors' counterfeit sales, and the lack of evidence of repeat offenders, a jury could conclude that Sapatis's actions were a reasonably effective deterrent to the sale of counterfeit goods.  Coach has not presented "clear and convincing evidence" to the contrary. See Gembitsky, 2009 WL 1273770, at *4.

**IV.   <u>CONCLUSION</u>**

Coach has failed to make a strong preliminary showing that it will succeed on the merits of its contributory infringement claims against Sapatis.  Accordingly, I deny the motion for a prejudgment writ of attachment.  (Doc. No. 53).

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

June 27, 2014

cc:  Erica Mecler Caron, Esq.
     Jeffrey K. Techentin, Esq.
     Kyle Zambarano, Esq.
     Lisa Snow Wade, Esq.
     Robert S. Carey, Esq.
     Jeremy T. Walker, Esq.
     Nicholas F. Casolaro, Esq.